No. 24-7243

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AMANDA HOUGHTON; CHARLES DOUGLAS; SUSAN FRANKLIN,
*Plaintiffs-Counterclaim Defendants-Appellees*,

v.

AH CAPITAL MANAGEMENT, L.LC.; BAIN CAPITAL VENTURES, LP; GAUNTLET
NETWORKS, INC.; GEOFFREY HAYES; PARADIGM OPERATIONS, LP,
*Defendants-Counterclaim Plaintiffs-Appellants*,

ROBERT LESHNER,
*Defendant-Appellant*,

COMPOUND DAO,
*Defendant*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:22-cv-7781 (Honorable William H. Orrick)

## OPENING BRIEF FOR DEFENDANTS-APPELLANTS

Susan E. Engel
David Steinbach
Alexander G. Siemers
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Morgan E. Whitworth
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

March 20, 2025

Samir Deger-Sen
Benjamin A. Naftalis
Douglas K. Yatter
Peter Trombly
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
samir.deger-sen@lw.com

*Counsel for AH Capital
Management, L.L.C.*

*Counsel for Defendants-Appellants*

*(Additional Counsel Listed On Inside Cover)*

Roger A. Cooper
Samuel Levander
CLEARY GOTTLIEB STEEN &
  HAMILTON, LLP
1 Liberty Plaza, Suite 1000
New York, NY 10006
(212) 225-2000
racooper@cgsh.com

*Counsel for Polychain Alchemy, LLC*

Peter B. Morrison
Zachary Faigen
SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM, LLP
2000 Avenue of the Stars, Suite 200 N
Los Angeles, CA 90067
(213) 687-5000
peter.morrison@skadden.com

Alexander Drylewski
SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM, LLP
1 Manhattan West
New York, NY 10001
(212) 735-3000

*Counsel for Paradigm Operations, LP*

Jason Gottlieb
Michael Mix
Vani Upadhyaya
MORRISON COHEN LLP
909 3rd Avenue, 27th Floor
New York, NY 10022
(212) 735-8600
jgottlieb@morrisoncohen.com

*Counsel for Robert Leshner, Geoffrey
Hayes, and Gauntlet Networks, Inc.*

Kayvan B. Sadeghi
JENNER & BLOCK, LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
ksadeghi@jenner.com

An N. Tran
JENNER & BLOCK, LLP
525 Market Street, 29th Floor
San Francisco, CA 94105
(628) 267-6800

*Counsel for Bain Capital
Ventures (GP), LLC*

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF JURISDICTION .................................................................. 6

STATEMENT OF THE ISSUES ...................................................................... 6

STATEMENT OF THE CASE .......................................................................... 6

    A.    Factual Background ................................................................... 6

        1.    COMP Tokens And Defendants' Alleged Coordination With Coinbase ............................................................. 6

        2.    Plaintiffs Purchase COMP On Coinbase ..................... 9

    B.    Proceedings Below ................................................................... 10

        1.    Plaintiffs' Claim ........................................................... 10

        2.    Defendants' Motion To Compel Arbitration .............. 13

        3.    The District Court's Decision ..................................... 16

SUMMARY OF ARGUMENT ......................................................................... 18

STANDARD OF REVIEW ............................................................................... 23

ARGUMENT ...................................................................................................... 23

I.    DEFENDANTS DID NOT WAIVE THEIR RIGHT TO ARBITRATE ............................................................................... 23

    A.    Defendants Lacked Knowledge Of An Existing Right To Compel Arbitration Until July 2024, And Defendants Engaged In No Intentional Acts Inconsistent With That Known Right ........... 25

    B.    The District Court Erred By Imposing A Novel Affirmative Discovery Obligation On Defendants ................................. 30

i

Page

II.   THE AGREEMENT REQUIRES THE ARBITRATOR TO DECIDE
      WHETHER  A  NONSIGNATORY  MAY  ENFORCE  THE
      ARBITRATION AGREEMENT AGAINST PLAINTIFFS ......................37

      A.   The Agreement Clearly And Unmistakably Delegates To The
           Arbitrator Whether Defendants Can Enforce It .................................37

           1.   The Agreement's Incorporation Of The AAA Rules
                Clearly And Unmistakably Delegates The Arbitrability
                Question  Of  Nonsignatory  Enforcement  To  The
                Arbitrator.................................................................................39

           2.   The Agreement's Express Delegation Provision Leaves
                No Doubt That Nonsignatory Enforcement Is For The
                Arbitrator To Decide................................................................42

      B.   The District Court Erred By Deciding The Question Of
           Nonsignatory Enforcement .............................................................45

III.  PLAINTIFFS ARE EQUITABLY ESTOPPED FROM AVOIDING
      ARBITRATION OF THEIR CLAIM ...........................................................52

      A.   Equitable Estoppel Bars Plaintiffs From Avoiding Arbitration
           Of Their Claim ................................................................................52

      B.   The District Court Erred In Rejecting Defendants' Equitable
           Estoppel Arguments .........................................................................59

CONCLUSION .................................................................................................62

STATEMENT OF RELATED CASES ...................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.B. v. Chart Industries, Inc. (In re Pacific Fertility Center Litigation)*,
  814 F. App'x 206 (9th Cir. 2020) .......................................................60

*American Express Co. v. Italian Colors Restaurant*,
  570 U.S. 228 (2013)...........................................................................38

*Anderton v. Practice-Monroeville, P.C.*,
  164 So. 3d 1094 (Ala. 2014).............................................................40

*Arthur Andersen LLP v. Carlisle*,
  556 U.S. 624 (2009)...........................................................................41

*B.D. v. Blizzard Entertainment, Inc.*,
  76 Cal. App. 5th 931 (2022) .............................................................25

*Becker v. Delek US Energy, Inc.*,
  39 F.4th 351 (6th Cir. 2022).............................................................44

*Bielski v. Coinbase, Inc.*,
  87 F.4th 1003 (9th Cir. 2023) ...........................................................37

*Black Knight, Inc. v. PennyMac Loan Services, LLC*,
  2021 WL 1087215 (M.D. Fla. Mar. 22, 2021) ..................................28

*Blanton v. Domino's Pizza Franchising LLC*,
  962 F.3d 842 (6th Cir. 2020) ...............................................39, 40, 46

*Brennan v. Opus Bank*,
  796 F.3d 1125 (9th Cir. 2015) .....................................................20, 39

*Britton v. Co-op Banking Group*,
  916 F.2d 1405 (9th Cir. 1990) ...........................................................27

*Brown v. Pacific Life Insurance Co.*,
  462 F.3d 384 (5th Cir. 2006) .............................................................55

**Page(s)**

*Cadena v. American Honda Motor Co.*,
2020 WL 3107797 (C.D. Cal. June 10, 2020) .................................................. 28

*Caremark, LLC v. Chickasaw Nation*,
43 F.4th 1021 (9th Cir. 2022) ........................................ 25, 37, 38, 41

*Casa Arena Blanca LLC v. Rainwater ex rel. Estate of Green*,
2022 WL 839800 (10th Cir. Mar. 22, 2022) ...................................... 45

*Chiron Corp. v. Ortho Diagnostic Systems, Inc.*,
207 F.3d 1126 (9th Cir. 2000) ...................................................... 24

*Coinbase, Inc. v. Bielski*,
599 U.S. 736 (2023) ...................................................................... 18

*Commercial Union Assurance Co. v. Milken*,
17 F.3d 608 (2d Cir. 1994) ...................................................... 58, 59

*Conover v. Dean Witter Reynolds, Inc.*,
837 F.2d 867 (9th Cir. 1988) ......................................................... 24

*Contec Corp. v. Remote Solution Co.*,
398 F.3d 205 (2d Cir. 2005) ......................................................... 51

*Eckert/Wordell Architects, Inc. v. FJM Properties of Willmar, LLC*,
756 F.3d 1098 (8th Cir. 2014) .................................................. 40, 51

*Epic Systems Corp. v. Lewis*,
584 U.S. 497 (2018) ...................................................................... 35

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) ...................................................................... 41

*Fisher v. A.G. Becker Paribas Inc.*,
791 F.2d 691 (9th Cir. 1986) ............................................... 3, 23, 35

*Franklin v. Community Regional Medical Center*,
998 F.3d 867 (9th Cir. 2021) ................................................ *passim*

*Green Tree Financial Corp.-Alabama v. Randolph*,
531 U.S. 79 (2000) ....................................................................... 35

iv

**Page(s)**

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    586 U.S. 63 (2019) .................................................................21, 37, 38

*Herrera v. Cathay Pacific Airways Ltd.*,
    104 F.4th 702 (9th Cir. 2024) ...........................................................*passim*

*Hill v. Xerox Business Services, LLC*,
    59 F.4th 457 (9th Cir. 2023) .............................................................*passim*

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002).....................................................................38, 50

*In re Intuniv Antitrust Litigation*,
    2021 WL 517386 (D. Mass. Jan. 29, 2021).....................................26, 28

*Johnson v. Walmart, Inc.*,
    57 F.4th 677 (9th Cir. 2023) ...................................................................43

*Johnson v. Zerbst*,
    304 U.S. 458 (1938)................................................................................24

*JPay, Inc. v. Kobel*,
    904 F.3d 923 (11th Cir. 2018) .........................................................38, 49

*JSM Tuscany, LLC v. Superior Court*,
    193 Cal. App. 4th 1222 (2011) ...............................................................52

*Knapke v. PeopleConnect, Inc.*,
    38 F.4th 824 (9th Cir. 2022) ...................................................................42

*Kramer v. Toyota Motor Corp.*,
    705 F.3d 1122 (9th Cir. 2013) ...............................................17, 21, 47, 48, 49

*Last v. M-I, L.L.C.*,
    2024 WL 551948 (E.D. Cal. Feb. 9, 2024) ................................................28, 33

*Letizia v. Prudential Bache Securities, Inc.*,
    802 F.2d 1185 (9th Cir. 1986) ...........................................................28, 30

*Martin v. Yasuda*,
    829 F.3d 1118 (9th Cir. 2016) ...........................................................24, 28, 36

**Page(s)**

*Metalclad Corp. v. Ventana Environmental Organizational Partnership*,
  109 Cal. App. 4th 1705 (2003) .................................................*passim*

*Morgan v. Sundance, Inc.*,
  596 U.S. 411 (2022)........................................................35

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
  460 U.S. 1 (1983)................................................4, 24, 34

*MouseBelt Labs Pte. Ltd. v. Armstrong*,
  674 F. Supp. 3d 728 (N.D. Cal. 2023).........................26, 28

*Newirth ex rel. Newirth v. Aegis Senior Communities, LLC*,
  931 F.3d 935 (9th Cir. 2019) ..........................24, 27, 30, 31

*Ngo v. BMW of North America, LLC*,
  23 F.4th 942 (9th Cir. 2022) .................................48

*O'Connor v. Uber Technologies, Inc.*,
  904 F.3d 1087 (9th Cir. 2018) .................................23

*Oracle America, Inc. v. Myriad Group A.G.*,
  724 F.3d 1069 (9th Cir. 2013) ..........................39, 40, 46

*Palmer v. Omni Hotel Management Corp.*,
  2016 WL 816017 (S.D. Cal. Mar. 1, 2016).........................33

*Parsittie v. Schneider Logistics, Inc.*,
  2023 WL 2629869 (C.D. Cal. Feb. 8, 2023) .........................26

*Pinter v. Dahl*,
  486 U.S. 622 (1988)........................................11, 54, 55

*Portland General Electric Co. v. Liberty Mutual Insurance Co.*,
  862 F.3d 981 (9th Cir. 2017) .................................42

*Randall v. Loftsgaarden*,
  478 U.S. 647 (1986)........................................58

*Rent-A-Center, West, Inc. v. Jackson*,
  561 U.S. 63 (2010).........................................38, 44

**Page(s)**

*Rhode Island v. Massachusetts*,
　37 U.S. (12 Pet.) 657 (1838) ................................................................46

*Rowe v. Exline*,
　153 Cal. App. 4th 1276 (2007) ...........................................................57

*Sakyi v. Estée Lauder Companies*,
　308 F. Supp. 3d 366 (D.D.C. 2018) ....................................................28

*SEC v. W.J. Howey Co.*,
　328 U.S. 293 (1946) ............................................................................57

*Swiger v. Rosette*,
　989 F.3d 501 (6th Cir. 2021) ........................................................44, 51

*Sywula v. Teleport Mobility, Inc.*,
　2023 WL 4630620 (S.D. Cal. July 18, 2023) .....................................33

*Tristar Financial Insurance Agency, Inc. v. Equicredit Corp. of
　America*,
　97 F. App'x 462 (5th Cir. 2004) ......................................26, 28, 32, 33

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
　595 U.S. 178 (2022)............................................................................25

*United States v. Olano*,
　507 U.S. 725 (1993)..........................................................................3, 24

*Van Ness Townhouses v. Mar Industries Corp.*,
　862 F.2d 754 (9th Cir. 1988) .............................................................24

*Wolfe v. Mattel, Inc. (In re Broderbund/Learning Co. Securities
　Litigation)*,
　294 F.3d 1201 (9th Cir. 2002) ...........................................................58

*Young v. ByteDance, Inc.*,
　700 F. Supp. 3d 808 (N.D. Cal. 2023)....................................53, 54, 60

*Young v. Solana Labs, Inc.*,
　2024 WL 4023087 (N.D. Cal. Sept. 3, 2024)......................................29

**Page(s)**

*Zirpoli v. Midland Funding, LLC*,
48 F.4th 136 (3d Cir. 2022) .........................................................................45, 51

**STATUTES**

9 U.S.C. § 16(a)(1)(B) ........................................................................................6

15 U.S.C. § 77*l*(a)(1) .....................................................................................10, 11

15 U.S.C. § 77v(a) ..............................................................................................6

15 U.S.C. § 77z-1(b)(1) ........................................................................13, 29, 31

28 U.S.C. § 1291 .................................................................................................6

28 U.S.C. § 1331 .................................................................................................6

**OTHER AUTHORITIES**

American Arbitration Association, Consumer Arbitration Rules,
Rule 14(a) (effective Sept. 1, 2014),
https://web.archive.org/web/20220221231848/https://www.adr.org
/sites/default/files/Consumer%20Rules.pdf ...............................................*passim*

*Black's Law Dictionary* (12th ed. 2024)..................................................................25

*Cambridge Dictionary*,
https://dictionary.cambridge.org/us/dictionary/english/scope (last
visited Mar. 18, 2025)...........................................................................................41

*Oxford English Dictionary*, https://www.oed.com
(last visited Mar. 18, 2025).........................................................................43, 44

13 Williston on Contracts (4th ed. 2024, Westlaw)................................................27

viii

# INTRODUCTION

This case raises questions of far-reaching importance regarding both the third-party enforcement of arbitration agreements and the legal standard governing waiver of the right to arbitrate.  The district court in this case made serious errors on both fronts.  First, although the contract at issue here unequivocally gave the arbitrator authority to resolve questions of nonsignatory enforcement, the district court held otherwise based on general language—ubiquitous in virtually any contract—that simply defined the parties to the agreement.  That holding reflects a startling overreading of this Court's precedent, and conflicts with decisions of other courts of appeals addressing materially identical contractual language.  The district court then compounded this error by misapplying California law on the question it should never have answered—whether equitable estoppel required Plaintiffs to arbitrate their dispute here.  Second, the district court reached an equally remarkable decision in finding that a nonsignatory defendant may intentionally relinquish a right to arbitrate even when the defendant is *unaware* of that right, by failing to seek discovery about possible arbitration agreements at some (unspecified) time "earlier" in the case.  That holding too reflects a novel departure from established law in this circuit and others. The decision below should be reversed.

Plaintiffs are individuals who obtained COMP, a digital asset, by using Coinbase, the United States' largest digital asset exchange.  Plaintiffs' use of

Coinbase's platform was governed by the Coinbase User Agreement ("Agreement"). That Agreement contains a broad arbitration clause that applies to disputes "relating in any way" to "any products sold or distributed through the Coinbase Site." 2-ER-81 (§ 1.1). In this action, Plaintiffs assert that their acquisitions of COMP on Coinbase were unregistered securities transactions solicited in violation of Section 12(a)(1) of the Securities Act of 1933 by Defendants—some of whom are the co-founders of a technology company called Compound Labs, some of whom are investors in Compound Labs, and one of whom is a service provider. Plaintiffs allege that these disparate Defendants "orchestrated and executed a comprehensive plan to solicit" their purchases by "persuad[ing]" Coinbase to list COMP for trading and "paying Coinbase to advertise COMP tokens for purchase." 2-ER-165–66. After Plaintiffs relied on these allegations to avoid dismissal, discovery revealed that Plaintiffs had accepted the Agreement and thus agreed to arbitrate any claims arising out of their use of the Coinbase site or any products they acquired on it, including COMP.

Based on the Agreement's broad arbitration clause, Defendants moved to compel arbitration. As a threshold matter, Defendants argued that the question of whether they were entitled to enforce the Agreement as nonsignatories must be resolved by the arbitrator. On the merits, Defendants argued that they may enforce the Agreement against Plaintiffs under the doctrine of equitable estoppel. The

district court denied Defendants' motion, concluding that (1) Defendants waived their right to compel arbitration, (2) a court—not the arbitrator—must decide questions of nonsignatory enforcement, and (3) equitable estoppel did not require Plaintiffs to arbitrate.

That decision was flawed several times over. To start, the district court's holding that Defendants waived their right to compel arbitration misapplies the legal standard for waiver. Waiver requires an intentional relinquishment of a known right. Here, there is no dispute that Defendants *did not know* of their right to arbitrate until Plaintiffs admitted during discovery that they assented to Coinbase's arbitration agreement. Because Defendants did not know of their right to arbitrate, they could not have intentionally relinquished it. *United States v. Olano*, 507 U.S. 725, 733 (1993). Indeed, Defendants are aware of no case where a party has been found to have waived a right it lacked knowledge of.

The district court broke new ground by inventing a test found nowhere in this Court's precedent: that a defendant's failure to seek discovery regarding whether a plaintiff had agreed to arbitrate "earl[y]" in the case, substitutes for the defendant's "knowledge" of a right to arbitrate. 1-ER-6–7. That test imposes a novel and unworkable duty to inquire on those seeking to enforce their right to arbitrate—and it is flatly inconsistent with this Court's admonition that "[w]aiver of a contractual right to arbitration is not favored," *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691,

694 (9th Cir. 1986), as well as the Supreme Court's instruction that "any doubts" regarding waiver must be resolved "in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

The district court also erred on the question of whether the arbitrability of the dispute was delegated to the arbitrator. The court overlooked that the Agreement clearly and unmistakably delegates the gateway question of nonsignatory enforcement to the arbitrator in two independent ways. First, the Agreement incorporates the AAA Rules, which, as this Court and others have uniformly held, provide clear and unmistakable evidence of intent to delegate questions of arbitrability. Those questions include disputes about the arbitrator's "jurisdiction" and an agreement's "scope"—terms that plainly encompass questions of nonsignatory enforcement. And second, the Agreement includes an express delegation clause that gives the arbitrator "exclusive authority" to resolve questions of "enforceability" and "scope." 2-ER-82 (§ 1.6). As with "scope," a delegation of "enforceability" to the arbitrator covers questions of nonsignatory enforcement. Each of these delegations alone would be sufficient to require an arbitrator to decide nonsignatory enforcement—and together they eliminate any doubt.

Finally, even if the district court had the authority to resolve questions of nonsignatory enforcement, its equitable estoppel ruling cannot stand. Equitable estoppel precludes Plaintiffs from benefiting from their Agreement with Coinbase

4

while avoiding the burden of arbitration. Plaintiffs' effort to circumvent this rule fails for two reasons. First, Plaintiffs' claim rests on allegations of "interdependent and concerted misconduct" that is within the scope of the arbitration agreement— *i.e.*, Defendants and Coinbase colluded to list COMP for trading and jointly promoted sales of COMP. *Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 707 n.5 (9th Cir. 2024) (citation omitted). As California courts have recognized, "the equitable estoppel doctrine applies when a party has signed an agreement to arbitrate but attempts to avoid arbitration by suing nonsignatory defendants for claims that are 'based on the same facts and are inherently inseparable' from arbitrable claims against signatory defendants." *Metalclad Corp. v. Ventana Env't Org. P'ship*, 109 Cal. App. 4th 1705, 1713 (2003) (citation omitted). Because *this exact case* would be subject to arbitration had Plaintiffs brought it against Coinbase, Plaintiffs cannot "avoid arbitration by suing [only] nonsignatory defendants." *Id.* Second, Plaintiffs' claim is "'intertwined with'"—indeed dependent upon—the Agreement. *Herrera*, 104 F.4th at 709-10 (citation omitted). Plaintiffs' claim "is rooted in" their "relationship" with Coinbase because they rely on Coinbase to prove that Defendants solicited their purchases of COMP, COMP qualifies as a security, and Plaintiffs are entitled to rescission, and this relationship is "governed by" the Agreement. *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 874-75 (9th Cir.

2021). Because Plaintiffs have used the Agreement to establish their claim against Defendants, they cannot avoid the concomitant obligation to arbitrate that claim.

The district court's decision should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 77v(a). On November 25, 2024, the district court denied Defendants' motion to compel arbitration. 1-ER-3–16. On November 26, 2024, Defendants filed a notice of appeal. 2-ER-271–75. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 9 U.S.C. § 16(a)(1)(B).

## STATEMENT OF THE ISSUES

1.    Whether Defendants waived their right to compel arbitration based on the Agreement.

2.    Whether an arbitrator must decide whether a nonsignatory can enforce the Agreement.

3.    Whether equitable estoppel requires arbitration of Plaintiffs' claim.

## STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    COMP Tokens And Defendants' Alleged Coordination With Coinbase

Defendants Robert Leshner and Geoffrey Hayes co-founded Compound Labs in 2017. 2-ER-185–86, 189 (¶¶ 8-9, 29). Compound Labs created the Compound

protocol, a software program allowing users to borrow and lend digital assets. 2-ER-184, 188–90 (¶¶ 1-2, 26, 30). Defendants AH Capital Management, L.L.C., Polychain Alchemy, LLC, Bain Capital Ventures, LP, and Paradigm Operations, LP, were alleged investors in Compound Labs, and Defendant Gauntlet Networks, Inc. provided risk-management services. 2-ER-186, 191, 204–05 (¶¶ 10-13, 34, 37, 100-01).[1]

In 2020, Compound Labs created a digital asset called COMP. 2-ER-191 (¶ 40). COMP is a governance token that can be used to vote on the parameters of the Compound protocol, subject to limits set in the protocol's code by the code's creators. 2-ER-188, 191, 194–95 (¶¶ 25, 40, 54). If this case were to proceed, Defendants would demonstrate that Plaintiffs' transactions in COMP are not securities transactions, but that question is not at issue in this appeal.

Beginning in 2020, Compound Labs distributed COMP tokens to its shareholders and members of the public who used the Compound protocol. 2-ER-192–94 (¶¶ 44, 48, 52). Many of those entities and individuals proceeded to resell COMP on the secondary market through digital asset exchanges. 2-ER-194–95 (¶¶ 54-55). According to Plaintiffs, Defendants encouraged such secondary-market

---

[1] In May 2020, Compound Labs transferred control over the Compound protocol to Compound DAO. 2-ER-184 (¶ 2). In November 2024, the district court granted Plaintiffs' renewed motion for alternative service on Compound DAO. *See* 1-ER-3–4.

transactions, including by working to ensure that COMP tokens would be tradeable on Coinbase. 2-ER-195, 202 (¶¶ 55, 86); *see also* 2-ER-196–98 (¶¶ 63-73).

On Coinbase, the "largest U.S.-based crypto asset exchange," 2-ER-166, users can store digital assets, as well as trade, purchase, and sell them on the secondary market. 2-ER-193–97 (¶¶ 63-69). According to Plaintiffs, however, exchanges such as Coinbase "generally do not list a new token ... without the cooperation or intervention of the developers of that token." 2-ER-201 (¶ 85). Plaintiffs allege that Defendants "endeavored to persuade" Coinbase to list COMP for trading as early as mid-2020, including by "directly contacting" Coinbase, "requesting that COMP be listed," "and/or compensating" Coinbase. 2-ER-193, 196–97, 200–02 (¶¶ 49, 63, 68, 83, 86). Those efforts allegedly led to Coinbase listing COMP on its exchange. 2-ER-197 (¶ 66).

Plaintiffs allege that Defendants then began to "work[] together with Coinbase ... to encourage and facilitate secondary-market purchases" of COMP. 2-ER-197–98 (¶¶ 68, 70). Coinbase added COMP to its "Earn" feature, through which Coinbase users receive COMP in exchange for watching "educational videos" "created by or at the direction of" Defendants "promoting the Compound protocol." 2-ER-197–98 (¶¶ 70, 73). Coinbase earned a commission based on the amount of COMP distributed to users. 2-ER-197–98 (¶ 70). In this way, Plaintiffs allege, Defendants used Coinbase's "platform to engage with [Coinbase] users" and "pa[id]

8

Coinbase a commission to sell or provide COMP to its investors." *Id.* According to Plaintiffs, by jointly "encourag[ing] ... investors to invest in COMP" and to "obtain more COMP," Coinbase and Defendants collectively "ensure[d] a robust secondary market for COMP." 2-ER-198 (¶ 70).

### 2. Plaintiffs Purchase COMP On Coinbase

Between late 2021 and late 2022, Plaintiffs purchased COMP "on the Coinbase exchange." 2-ER-187 (¶ 15); *see also id.* (¶¶ 16-17). Specifically, Ms. Franklin purchased $2 worth of COMP on Coinbase in December 2021, *id.* (¶ 17); Ms. Houghton purchased $3 worth of COMP on Coinbase in November 2022, *id.* (¶ 16); and Mr. Douglas purchased $75 worth of COMP on Coinbase in January 2022, *id.* (¶ 15). Ms. Franklin and Ms. Houghton each additionally obtained approximately $9 worth of COMP by watching videos via Coinbase Earn. *Id.* (¶¶ 16-17).

Use of Coinbase's services is governed by the Coinbase User Agreement. 2-ER-55. The Agreement includes an arbitration agreement. Specifically, subject to certain exceptions, Section 1.1 of the arbitration agreement provides that "any dispute, claim, [or] disagreements arising out of or relating in any way to ... any products sold or distributed through the Coinbase Site ... will be resolved by binding arbitration, rather than in court." 2-ER-81 (§ 1.1).

In Section 1.6, under the heading "**Authority of Arbitrator**," the Agreement states that "[t]he arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement." 2-ER-82 (§ 1.6).

The Agreement also states that "[t]he arbitration will be administered by the American Arbitration Association ('AAA'), in accordance with the Consumer Arbitration Rules (the 'AAA Rules') then in effect." 2-ER-82 (§ 1.4). Under AAA Rule 14, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." American Arbitration Association, Consumer Arbitration Rules ("AAA Rules"), Rule 14(a) (effective Sept. 1, 2014), https://web.archive.org/web/20220221231848/https://www.adr.org/sites/default/files/Consumer%20Rules.pdf.

## B.    Proceedings Below

### 1.    Plaintiffs' Claim

On December 8, 2022, Plaintiffs filed this action against Defendants seeking rescission of the purchases they made on Coinbase under Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*(a)(1). 2-ER-227–70; 2-ER-182–226 (First

Amended Complaint). Section 12(a)(1) provides that "[a]ny person who ... offers or sells a security in violation of" Section 5's registration requirements "shall be liable ... to the person purchasing such security *from him*." 15 U.S.C. § 77*l*(a)(1) (emphasis added).

Plaintiffs do not—and cannot—contend that they purchased COMP directly "from" any Defendant. *See* 2-ER-178. Instead, in an effort to bring their claim within Section 12, Plaintiffs argue that Defendants "solicited" their COMP purchases through, and in collaboration with, Coinbase. 2-ER-197 (¶ 68); *see also* 2-ER-169–77. To establish liability under this theory, a plaintiff must show that a defendant "successfully solicit[ed] the [plaintiff's] purchase [of such security], motivated at least in part by a desire to serve [its] own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 647 (1988). This standard follows from Section 12(a)(1)'s text, which creates a private right of action only for a "'person purchasing such security *from* [the defendant],'" and thus "contemplates a buyer-seller relationship not unlike traditional contractual privity." *Id.* at 641-42 (emphasis added) (citation omitted). Being a "substantial factor in causing the transaction to take place" is insufficient to establish solicitation liability. *Id.* at 648-54 (citation omitted). Rather, it must be "fair to say that the buyer 'purchased' the security from" the soliciting party in a way that makes that party equivalent to "the owner in a rescission action." *Id.* at 647.

11

Endeavoring to meet this statutory requirement, Plaintiffs' allegations center on Defendants' purported *coordination* with Coinbase regarding the listing, promotion, and selling of COMP. Indeed, when Defendants moved to dismiss Plaintiffs' amended complaint, Plaintiffs specifically relied upon that alleged coordination to argue that Defendants had "sold" them COMP within the meaning of Section 12(a)(1). *See* 2-ER-180–81; 2-ER-169–73. For example, Plaintiffs emphasized how Defendants allegedly "worked directly with" and "persuaded" Coinbase to list COMP for trading, such that there "would be an easy way for people to buy and sell COMP" on the secondary market. 2-ER-171; *see* 2-ER-196–97, 200–02 (¶¶ 63-68, 83, 86). And Plaintiffs highlighted how Defendants "paid Coinbase to show promotional videos about Compound to its users in exchange for COMP," thereby using Coinbase Earn to "target[]" investors and "get[] them to buy COMP." 2-ER-170, 172–73; *see* 2-ER-197–98 (¶¶ 70-71). By working closely with Coinbase to "enable and encourage secondary market trading of COMP," Plaintiffs argued, Defendants allegedly "solicited" their purchases of COMP. 2-ER-169–70, 178. Plaintiffs have never suggested that they could satisfy Section 12's solicitation standard absent Defendants' alleged coordination with Coinbase.

The district court denied Defendants' motion to dismiss on September 20, 2023. 2-ER-153. Defendants' relationship with Coinbase was central to the district court's conclusion that Plaintiffs had plausibly pleaded solicitation. For example,

the district court relied on Plaintiffs' allegations that Defendants "'agreed to pay Coinbase a commission to sell or provide COMP to its investors'" and "'to encourage those investors to invest in COMP through "education videos" created by or at the direction of'" Defendants.  2-ER-158 n.4 (quoting 2-ER-197–98 (¶ 70)); *see also* 2-ER-157 (emphasizing Defendants' alleged "efforts to ... bring [COMP] to secondary markets").  The district court concluded that those allegations were "sufficient" to withstand Defendants' motion to dismiss.  2-ER-158 n.4.

### 2.    Defendants' Motion To Compel Arbitration

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), discovery is "stayed during the pendency of any motion to dismiss."  15 U.S.C. § 77z-1(b)(1).  Thus, following resolution of the motion to dismiss, Defendants began the process of seeking discovery regarding Plaintiffs' claim.  Discovery in this case was slow on both sides; the parties spent the initial months negotiating a protective order that substantially modified the district court's model protective order, and the district court did not issue an order governing discovery of electronically stored information until May 2024.  *See* 2-ER-105–34; 2-ER-308 (Dkt. No. 157).  In discovery responses served on July 9, 2024, Plaintiffs admitted— for the first time—that they had accepted the Coinbase User Agreement before

13

purchasing COMP on Coinbase. *See* 2-ER-89, 95, 101.[2] Prior to that admission, Defendants did not know whether Plaintiffs had accepted that Agreement or opted out of it.

On August 12, 2024, Defendants moved to compel arbitration. *See* 2-ER-25. Defendants explained that Plaintiffs' Section 12 claim fell squarely within the Agreement's broad reach, because it "'aris[es] out of or relat[es]'" to the COMP "sold" to Plaintiffs "through the Coinbase Site." 2-ER-40 (quoting 2-ER-81 (§ 1.1)). Defendants relied on Plaintiffs' July 9, 2024 admissions to establish Plaintiffs' acceptance of the Agreement. 2-ER-35, 39.

Defendants next contended that any dispute over whether Defendants as nonsignatories could enforce the arbitration agreement was for the arbitrator to resolve. 2-ER-33, 41–44. The Agreement provided that the arbitrator has "*exclusive* authority" to determine the "enforceability" and "scope" of the Agreement, as well as to "resolve any Dispute ... arising out of or related to [the Agreement's] interpretation or application." 2-ER-82 (§ 1.6) (emphasis added). The Agreement also incorporated the AAA's Consumer Arbitration Rules, 2-ER-82 (§ 1.4), which similarly delegated to the arbitrator any question regarding the arbitrator's

---

[2] Plaintiffs also admitted that they accepted Coinbase's User Agreement when Coinbase updated the Agreement on January 31, 2022. *See* 2-ER-90, 95, 102. As in the district court, Defendants focus on the language from the 2022 User Agreement. *See* 2-ER-36 & n.2.

"jurisdiction," including the Agreement's "scope" and the "arbitrability" of any claim. AAA Rules, Rule 14(a).

Finally, Defendants argued that even if the district court were authorized to resolve the issue, it should conclude that Plaintiffs' claim was subject to arbitration under the doctrine of equitable estoppel. 2-ER-44–49. Under this doctrine, nonsignatories have the right to arbitrate claims against them under two circumstances. First, nonsignatories are entitled to arbitrate where the claims are based on allegations of concerted misconduct by the nonsignatory and a party to the arbitration agreement, and the claims are within the arbitration agreement's scope. *See Metalclad*, 109 Cal. App. 4th at 1718-19. That condition is satisfied here because Plaintiffs allege that Defendants "work[ed] together with Coinbase" to perform the actions that allegedly give rise to liability, and those actions were within the scope of the arbitration agreement that Plaintiffs agreed to with Coinbase (and thus would have required arbitration had Plaintiffs challenged the same actions in a suit against Coinbase). 2-ER-33–34 (citation omitted). And second, nonsignatories are entitled to arbitrate where the claims against them are "'intertwined with'" and "rooted in" a "relationship" "governed by" that agreement. *Franklin*, 998 F.3d at 874-75 (citation omitted). Here, Plaintiffs' claim is rooted in the listing and promotion of COMP on Coinbase, restrictions on governance token voting, and fees charged by Coinbase—all of which are governed by the Agreement. 2-ER-44–46.

3.    The District Court's Decision

On November 25, 2024, the district court denied Defendants' motion to compel arbitration.  1-ER-3.

The district court first held that Defendants "have waived any right to seek to compel arbitration."  1-ER-8.  The court acknowledged that Plaintiffs had only "recently" admitted their acceptance of the Agreement in their discovery responses. 1-ER-6–7.  But the court speculated that Defendants could have obtained Plaintiffs' admissions sooner by seeking "limited discovery" at some point "earlier" in the case, and reasoned that Defendants' failure to do so established their knowledge of a right to arbitrate.  1-ER-7.  The court also determined that Defendants' failure to pursue such discovery, along with their participation in the litigation before moving to compel arbitration, was inconsistent with their known right to arbitrate.  1-ER-7–8. The court cited no authority imposing an obligation on a defendant to seek discovery about possible arbitration agreements "earl[y]" in a case.

Although the district court described its waiver holding as "sufficient" to deny arbitration, the district court went on to find that the court, not an arbitrator, must decide whether nonsignatories could enforce the Agreement's arbitration clause.  1-ER-8–10.  The court acknowledged that the Agreement's delegation provision gives the "arbitrator"—not a court—"exclusive authority to resolve" disputes over the Agreement's "enforceability" or "scope."  1-ER-4–5, 8 (quoting 2-ER-82).  But the

16

court observed that some language in the Agreement's "[p]reamble"—prior to the actual arbitration agreement—refers to arbitrable disputes between "YOU AND COINBASE" or "YOU AND US." 1-ER-9 (quoting 2-ER-55). The district court then read this Court's decision in *Kramer v. Toyota Motor Corp.* to stand for the proposition that any such language identifying the parties to an agreement precludes a finding that the parties intended "to arbitrate arbitrability with nonsignatories." 1-ER-9 (quoting 705 F.3d 1122, 1127 (9th Cir. 2013)).

Finally, on the merits of Defendants' motion, the district court held that Defendants may not rely on equitable estoppel to enforce the arbitration agreement against Plaintiffs. 1-ER-10. Focusing on the Agreement's relationship to Plaintiffs' claim rather than the conduct giving rise to it, the court held that there was "not 'interdependent and concerted misconduct' that is 'founded in or intimately connected with the obligations of the *underlying agreement*,'" because Plaintiffs "could have purchased COMP on any exchange" and brought "the exact same claim[s]." 1-ER-11–12 (emphasis added) (citation omitted). And although the court acknowledged that "Coinbase's actions are relevant" to Plaintiffs' solicitation claim, the court concluded that equitable estoppel did not apply because Plaintiffs' Section 12(a)(1) claim is not "intimately founded in or intertwined with" *the Agreement* since the court "will not need to address (much less rely on) the Coinbase User Agreement" to resolve the claim. 1-ER-10–11.

Defendants filed a notice of appeal the day after the district court denied their motion. 2-ER-271–75. Although district-court proceedings are automatically stayed pending a defendant's appeal of a decision denying a motion to compel arbitration, *see Coinbase, Inc. v. Bielski*, 599 U.S. 736, 742-44, 747 (2023), Plaintiffs argued that the district court should "retain jurisdiction" because Defendants' appeal is "frivolous" and "waived." 2-ER-22. The district court rejected both arguments. 2-ER-19–20 & n.1. In doing so, the court determined that Defendants had not "act[ed] in bad faith," and the court acknowledged that Defendants' motion to compel arbitration may "find more sympathetic ears" in the Ninth Circuit. 2-ER-20.

## SUMMARY OF ARGUMENT

None of the reasons the district court gave for denying Defendants' motion to compel arbitration withstands scrutiny.

**I.** The district court erroneously held that Defendants waived their right to compel arbitration. To establish waiver by Defendants, Plaintiffs must show that Defendants had "(1) *knowledge* of an existing right to compel arbitration" and undertook "(2) intentional acts inconsistent with that existing right." *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 468 (9th Cir. 2023) (emphasis added). Plaintiffs cannot do so.

**A.** To prove the "knowledge" element of waiver, a plaintiff must show that the defendant was aware that the plaintiff had accepted an arbitration agreement

18

covering the plaintiff's claims.  Here, Defendants did not know of an existing right to compel arbitration until Plaintiffs admitted during discovery that they assented to the Coinbase User Agreement.  Simply knowing that Plaintiffs purchased COMP on Coinbase did not inform Defendants, who are nonsignatories to Plaintiffs' contracts with Coinbase, that Plaintiffs had actually *agreed* to arbitrate with Coinbase.  A party, after all, might opt out of an arbitration agreement, or a party might not receive adequate notice of an agreement's terms based on the manner or circumstances in which they are presented.  After receiving Plaintiffs' discovery responses revealing the existence of a right to arbitrate in July 2024, Defendants moved expeditiously to compel arbitration in August 2024.  None of Defendants' litigation conduct during that relevant time period was inconsistent with asserting a known right to compel arbitration.  Defendants thus did not waive their right to arbitrate.

**B.**     The district court's waiver decision turned on its belief that Defendants had an affirmative obligation to seek "discovery" regarding possible arbitration agreements "earlier" in the case.  The district court thus charged Defendants with knowledge of an existing arbitration right even before Defendants gained awareness of that right through Plaintiffs' discovery responses.  The district court's "early discovery" rule is flatly inconsistent with settled principles (1) requiring knowledge as a prerequisite for waiver and (2) resolving all doubts about waiver in favor of arbitration.  This Court should firmly reject the imposition of a novel waiver rule

under which "knowledge" turns on a standardless assessment of whether discovery requests are served quickly enough.

**II.**     The district court erroneously held that it—and not the arbitrator—was required to decide whether the nonsignatory Defendants could enforce the Agreement against Plaintiffs.

**A.**     The Agreement clearly and unmistakably delegates questions regarding nonsignatory enforcement, because it incorporates the AAA Rules and contains an express delegation clause.  Under this Court's precedent, "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). The questions of arbitrability covered by the AAA Rules include questions about an arbitrator's "jurisdiction" and an agreement's "scope"—terms that encompass questions of nonsignatory enforcement.   And the express delegation clause independently requires the same result by giving the arbitrator "exclusive authority" to resolve questions of "enforceability" and "scope."   The delegation here was as clear as they come.

**B.**     In holding otherwise, the district court gave short shrift to the AAA Rules and the delegation clause, focusing instead on references to the Agreement's signatories in the Agreement's Preamble.  But if a contract's prefatory references to the parties with language such as "you" or "us" were enough to preclude delegation

of nonsignatory enforcement, such delegation would be impossible. After all, nonsignatories are, by definition, not mentioned in the contract. But it is well-settled that nonsignatories may nonetheless enforce arbitration agreements, *Franklin*, 998 F.3d at 870, and that parties may consent to an arbitrator deciding whether such enforcement is permitted, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). The district court rooted its contrary holding in a vast overreading of this Court's decision in *Kramer*, which involved an arbitration agreement very different from the one here. *See* 705 F.3d at 1124-25. That sweeping reading of *Kramer* conflicts with the Supreme Court's recognition that nonsignatory enforcement is a threshold question of arbitrability and multiple other circuits' precedent enforcing delegation clauses in the face of contracts with materially identical "you and us" language that the Agreement contains.

    **III.**    The district court erred on the merits in finding that equitable estoppel did not apply.

    **A.**    Under California law, a nonsignatory can enforce an arbitration agreement against a signatory plaintiff whose claims (1) rest on allegations of interdependent and concerted misconduct between a signatory and a nonsignatory that is within the scope of the arbitration agreement; or (2) are intertwined with a contract requiring arbitration. *Herrera*, 104 F.4th at 707 n.5, 709-10. Both grounds apply here. First, Plaintiffs allege collusive behavior by Defendants and Coinbase

21

with respect to the listing and promotion of COMP that "relate[s] … to … any products sold or distributed through the Coinbase Site." 2-ER-81 (§ 1.1). Because Plaintiffs could not avoid arbitration if they asserted the "same" allegations and claim against Coinbase, they cannot avoid arbitration by omitting Coinbase as a defendant and bringing identical allegations against Defendants alone. *Metalclad*, 109 Cal. App. 4th at 1713 (citation omitted). Second, Plaintiffs must arbitrate their claim because it is "rooted" in Plaintiffs' "relationship" with Coinbase, which is "governed" by an arbitration agreement. *Franklin*, 998 F.3d at 875. Because Plaintiffs press a theory of liability that depends on activities subject to the Agreement, Plaintiffs must arbitrate their claim against Defendants.

**B.** The district court erred in refusing to hold that Plaintiffs are equitably estopped from avoiding arbitration. The district court refused to compel arbitration based on Plaintiffs' allegations of concerted misconduct because, in theory, Plaintiffs could have purchased COMP on a different platform that did not require arbitration. To start, that reasoning ignores that Plaintiffs' claim is based on Defendants' interdependent *conduct with* Coinbase, not just the fact that Plaintiffs acquired their COMP tokens on the Coinbase platform. And, in any event, equitable estoppel depends on the actual factual allegations—not hypothetical alternatives. Because Plaintiffs' claim depends on Defendants' collusion with Coinbase as to conduct within the Agreement's scope, equitable estoppel applies. The district court

also found that the second pathway to equitable estoppel under California law was not satisfied because Plaintiffs neither "asserted [liability] against Coinbase" nor argued that the court would "need to address" provisions of the Agreement. 1-ER-10. But, as this Court has explained, equitable estoppel applies even where a party does not sue the signatory or expressly refer to the contract containing the arbitration agreement. *Franklin*, 998 F.3d at 875. A plaintiff cannot simultaneously rely on a relationship governed by an arbitration agreement to advance a claim yet avoid the obligation to arbitrate by not including a signatory as a defendant or not mentioning the arbitration agreement. *See id.* at 875-76.

## STANDARD OF REVIEW

This Court reviews an order denying a motion to compel arbitration de novo. *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1093 (9th Cir. 2018).

## ARGUMENT

## I.    DEFENDANTS DID NOT WAIVE THEIR RIGHT TO ARBITRATE

The district court held that Defendants waived their right to arbitrate despite not even knowing of that right until shortly before they sought to compel arbitration. That holding, which was premised on a novel duty to engage in "early" discovery, badly misapplied this Court's precedents and should be reversed.

As this Court has repeatedly made clear, "[w]aiver of a contractual right to arbitration is not favored." *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694

23

(9th Cir. 1986).  That principle derives from the harsh results that waiver inflicts on litigants by extinguishing their valid "contractual right[s]."  *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 758 (9th Cir. 1988).  And it accords with the "liberal federal policy favoring arbitration agreements," which requires this Court to resolve "any doubts" about whether a defendant waived its arbitration right "in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000).  Plaintiffs accordingly bear a heavy "burden of proof" when attempting to show that Defendants waived their right to compel arbitration.  *Martin v. Yasuda*, 829 F.3d 1118, 1124 (9th Cir. 2016) (citation omitted); *see also Newirth ex rel. Newirth v. Aegis Senior Cmtys., LLC*, 931 F.3d 935, 940 (9th Cir. 2019).

"[W]aiver is the 'intentional relinquishment or abandonment of a known right.'"  *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  Mere delay in seeking arbitration does not amount to waiver of the right to arbitrate.  *See Martin*, 829 F.3d at 1127 n.5; *Conover v. Dean Witter Reynolds, Inc.*, 837 F.2d 867, 868 (9th Cir. 1988).  Rather, to establish waiver, the party opposing arbitration must show that the moving party had "(1) knowledge of an existing right to compel arbitration" and undertook "(2) intentional acts inconsistent with that existing right."  *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 468 (9th Cir. 2023).

Here, Defendants did not know of their right to arbitrate until July 9, 2024, when Plaintiffs revealed that they had accepted the Agreement and the arbitration provision therein. Defendants promptly moved to compel arbitration upon learning of their right to do so. Because Defendants engaged in no intentional acts inconsistent with a known right to arbitrate, Defendants did not waive their right to arbitrate under a straightforward application of this Court's precedents. The district court's erroneous conclusion to the contrary should be reversed.

> **A.** **Defendants Lacked Knowledge Of An Existing Right To Compel Arbitration Until July 2024, And Defendants Engaged In No Intentional Acts Inconsistent With That Known Right**

1. To establish the first prong of the waiver test, Plaintiffs must show that Defendants had "*knowledge* of an *existing right to compel arbitration*." *Hill*, 59 F.4th at 468 (emphases added). "Knowledge" means "[a]n awareness or understanding of a fact or circumstance." *Black's Law Dictionary* (12th ed. 2024); *see also Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 184 (2022) (explaining that "'knowledge' has historically 'meant and still means "the fact or condition of being aware of something"'" (citation omitted)). And in order to compel arbitration, a court must determine "whether an arbitration agreement was formed," *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022), which under California law requires "[m]utual assent, or consent, of the parties," *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 943 (2022) (citation omitted).

25

Accordingly, to prove the "knowledge" element of waiver, a plaintiff must show that the defendant was *aware* that the plaintiff had *accepted* an arbitration agreement covering the plaintiff's claims.  Absent those circumstances, the defendant lacks "knowledge of an existing right to compel arbitration." *Hill*, 59 F.4th at 468.

Consistent with these principles, courts have held that a defendant seeking arbitration lacks "knowledge" of an existing arbitration right when the defendant is unaware that the plaintiff had accepted an arbitration agreement covering the plaintiff's claims.  For instance, the Fifth Circuit determined that a defendant lacked knowledge of a right to arbitrate during a time when the defendant was "unaware" that the plaintiff had executed an arbitration agreement, and that the defendant only gained such knowledge when the agreement was "produced in discovery." *Tristar Fin. Ins. Agency, Inc. v. Equicredit Corp. of Am.*, 97 F. App'x 462, 465 (5th Cir. 2004).  District courts have likewise concluded that nonsignatory defendants do not have knowledge of a right to arbitrate when they are not in "possession" of an arbitration agreement formed between the plaintiff and a third party, regardless of whether the defendants might have "suspected that an arbitration agreement existed." *Parsittie v. Schneider Logistics, Inc.*, 2023 WL 2629869, at *4 (C.D. Cal. Feb. 8, 2023); *see also, e.g.*, *MouseBelt Labs Pte. Ltd. v. Armstrong*, 674 F. Supp. 3d 728, 735-36 (N.D. Cal. 2023); *In re Intuniv Antitrust Litig.*, 2021 WL 517386, at *9-10 (D. Mass. Jan. 29, 2021).  In each case, the defendant only acquired

"knowledge" of an arbitration right upon learning that the plaintiff had accepted an arbitration agreement.

The second prong of the waiver inquiry confirms that a defendant lacks knowledge of an existing arbitration right absent awareness that the plaintiff had accepted an arbitration agreement. To establish that prong, a plaintiff must show that the defendant undertook "intentional act[s] inconsistent with [a] *known right* to compel arbitration." *Newirth*, 931 F.3d at 942 (emphasis added). A defendant does not "intentional[ly] relinquish[]" a right to compel arbitration when it remains unaware that the right exists. *Id.* at 940, 942 (citation omitted). Similarly, implicit waiver only occurs when a party takes "clear, unequivocal, and decisive act[s] … so consistent with an intention to waive that no other reasonable explanation is possible." 13 Williston on Contracts § 39:28 (4th ed. 2024, Westlaw). A party cannot "clear[ly]" and "unequivocal[ly]" act with an "intention" to waive an arbitration right unless the party did so with awareness of that right. *Id.*

This Court's precedents are in accord with that basic notion. This Court has emphasized that the critical moment for waiver purposes is "when" the "evidence establish[es]" that a nonsignatory defendant acquires "'knowledge' of his right to compel arbitration"—in other words, when the defendant gains awareness of his arbitration right. *Britton v. Co-op Banking Grp.*, 916 F.2d 1405, 1408, 1413 (9th Cir. 1990). This Court has found no waiver when defendants pursued their right to

arbitrate as soon as they learned during discovery that such a right existed. *Letizia v. Prudential Bache Sec., Inc.*, 802 F.2d 1185, 1187 & n.3 (9th Cir. 1986). And this Court has explained that "absence of knowledge" can defeat a waiver claim even when the motion to compel is "filed after substantial litigation." *Martin*, 829 F.3d at 1127 n.5.

Other courts, too, have focused the waiver analysis on the moment a defendant gains awareness of an existing arbitration right. *See, e.g.*, *Tristar*, 97 F. App'x at 465 (finding no waiver when defendant "promptly moved to compel arbitration once it became aware of the arbitration clause"); *In re Intuniv*, 2021 WL 517386, at *11 (finding no waiver when nonsignatory defendant "was not aware of the arbitration agreements when it was invoking the litigation machinery"); *Cadena v. Am. Honda Motor Co.*, 2020 WL 3107797, at *4, *8 (C.D. Cal. June 10, 2020) (explaining that relevant moment for waiver is when defendant becomes "aware of its right to enforce the arbitration clause"); *MouseBelt Labs*, 674 F. Supp. 3d at 736 (finding it "of no consequence" that defendants moved to compel arbitration "after substantial litigation" because defendants lacked "knowledge of the arbitration clauses" until plaintiff produced the agreements midway through litigation); *Black Knight, Inc. v. PennyMac Loan Servs., LLC*, 2021 WL 1087215, at *9 (M.D. Fla. Mar. 22, 2021); *Last v. M-I, L.L.C.*, 2024 WL 551948, at *6 (E.D. Cal. Feb. 9, 2024); *Sakyi v. Estée Lauder Cos.*, 308 F. Supp. 3d 366, 383 (D.D.C. 2018). In each of these cases, what

mattered was whether the defendant acted inconsistently with an existing arbitration right *after* the defendant gained awareness of that right.

2.     The district court failed to apply these principles.  Before Plaintiffs' July 9, 2024 discovery responses, Defendants knew only that Plaintiffs had allegedly purchased COMP tokens on Coinbase.  Defendants did not know whether Plaintiffs had *agreed to the Coinbase User Agreement*, whether they had opted out of it, or whether it otherwise did not apply.  For example, Defendants did not know whether Plaintiffs had received adequate notice of the Agreement, or even whether Plaintiffs purchased COMP using their own Coinbase accounts.  Defendants, after all, lack knowledge of the contents of Coinbase's internal records, as Coinbase is not a party to this action and is a corporate entity entirely distinct from Defendants.  And, as noted above, discovery is automatically stayed under the PSLRA during the pendency of a defendant's motion to dismiss.  *See* 15 U.S.C. § 77z-1(b)(1).  District courts, moreover, have *denied* arbitration when a defendant lacks evidence showing that the plaintiff had agreed to a third party's arbitration provision.  *See, e.g.*, *Young v. Solana Labs, Inc.*, 2024 WL 4023087, at *3-4 (N.D. Cal. Sept. 3, 2024).  Only through Plaintiffs' admissions in response to discovery requests (after the automatic discovery stay was lifted) did Defendants learn that Plaintiffs accepted the Agreement prior to making their COMP purchases, accepted the updated

Agreement, and did not opt out of the Agreement. *See* 2-ER-89–92; 2-ER-95–98; 2-ER-101–04.

Defendants thus lacked knowledge of an existing right to compel arbitration prior to July 9, 2024. That date, accordingly, is the time from which to assess whether Defendants engaged in "intentional act[s] inconsistent with [a] *known right* to compel arbitration." *Newirth*, 931 F.3d at 942 (emphasis added). And here, Defendants promptly moved to compel arbitration just a month after gaining awareness of their right to arbitrate through Plaintiffs' discovery responses. *See* 2-ER-25. That is the epitome of "actively pursu[ing]" a right to arbitrate. *Letizia*, 802 F.2d at 1187 n.3. Because Defendants undertook no intentional acts inconsistent with their known and existing right to compel arbitration, they did not waive that right.

### B. The District Court Erred By Imposing A Novel Affirmative Discovery Obligation On Defendants

The district court's waiver decision turned on its belief that Defendants had a duty to inquire about the existence of a right to compel arbitration. Specifically, the district court concluded that Defendants had an affirmative obligation to "secure[] limited discovery" and thereby learn of Plaintiffs' acceptance of the Agreement "earlier in th[e] case." 1-ER-7. The district court thus charged Defendants with knowledge of their right to arbitrate before Defendants first obtained that knowledge through Plaintiffs' July 9, 2024 discovery responses. *See* 1-ER-6–7. The district

30

court also found that Defendants acted inconsistently with their arbitration right based on Defendants' conduct over the entire course of the litigation—that is, conduct occurring *before* Defendants learned of their right to arbitrate on July 9, 2024. *See* 1-ER-7–8. That was error.

The district court's "early discovery" holding imposes a novel affirmative obligation on parties seeking to compel arbitration that has no basis in waiver law. A defendant does not clearly and "intentional[ly] relinquish[]" a right to compel arbitration, *Newirth*, 931 F.3d at 940 (citation omitted), simply by failing to ask the district court to permit the defendant to seek limited discovery regarding a plaintiff's potential acceptance of an arbitration agreement. That is especially true when the district court cannot even order the relevant discovery. Consider the facts of this case. Defendants had no basis during the pendency of their motion to dismiss to speculate as to whether Plaintiffs had agreed to arbitrate any dispute arising out of their use of the Coinbase platform, as the PSLRA's discovery stay barred any such inquiry. *See* 15 U.S.C. § 77z-1(b)(1). Then, after the discovery stay was lifted, Defendants sought discovery regarding Plaintiffs' potential agreement to arbitrate their claim at the same time they sought other merits discovery. Only after Plaintiffs responded did Defendants learn that Plaintiffs had, in fact, agreed to arbitrate their claim. Defendants did not "intentional[ly] relinquish[]" an arbitration right simply by not pursuing such discovery earlier. *Newirth*, 931 F.3d at 940 (citation omitted).

Nor does a nonsignatory defendant have "*knowledge* of an existing right to compel arbitration," *Hill*, 59 F.4th at 468 (emphasis added), simply because it was *possible* for the defendant to have obtained such knowledge earlier. If that were the law, litigants would be charged with knowledge of all sorts of information in the sole and exclusive possession of third parties, simply because they *could have* obtained that knowledge. And litigants would thus risk waiver of all sorts of rights based on how they sequence discovery, or on whether they delay discovery for any reason, such as pursuing settlement negotiations.

That is not the law, and the district court offered no authority in support of its apparent conclusion. Nor have Plaintiffs cited any decision construing "knowledge" to mean the ability to acquire knowledge via discovery. On the contrary, the district court's decision contravenes numerous cases holding that defendants lack knowledge of an existing arbitration right when they are unaware that the plaintiff had executed an arbitration agreement, even though the defendant might have acquired such knowledge by seeking discovery earlier in the litigation. *Supra* at 26-29. For instance, in *Tristar*, the defendant was "unaware" that the plaintiff had executed an arbitration agreement "until it was produced in discovery." 97 F. App'x at 465. The Fifth Circuit acknowledged that the defendant could have "discover[ed] the [arbitration] agreement earlier." *Id.* at 466. But the court held that the possibility of earlier discovery did not alter the waiver analysis. *Id.* Rather, because the

32

defendant lacked awareness of the arbitration agreement, it did not have the required knowledge of an existing right to arbitrate—regardless of whether the defendant could have obtained that knowledge earlier. *Id.* at 465-66.[3]

The district court's "early discovery" rule is also in tension with the numerous cases holding that a defendant is not subject to waiver simply by engaging in discovery even *after* the defendant knows of its right to arbitrate. Indeed, courts have repeatedly held that a defendant's participation in discovery is not an "intentional act[] inconsistent" with the right to arbitrate. *See, e.g., Last*, 2024 WL 551948, at *7-8 (discovery activity, including five depositions, not inconsistent acts); *Sywula v. Teleport Mobility, Inc.*, 2023 WL 4630620, at *10 (S.D. Cal. July 18, 2023) (plaintiff did not "cite any instance in which a court has determined discovery requests alone—however extensive—are so inconsistent with a right to arbitrate that they effect waiver"); *Palmer v. Omni Hotel Mgmt. Corp.*, 2016 WL 816017, at *3-4 (S.D. Cal. Mar. 1, 2016) (engaging in written discovery, noticing multiple depositions, and taking a deposition not inconsistent acts). It would thus

---

[3]   Even if a defendant might in some circumstances be charged with knowledge of an arbitration agreement to which it was a signatory, it certainly does not follow that a *nonsignatory* could be charged with knowledge of an arbitration agreement between two unrelated parties that is not—and was never—in the nonsignatory's possession.

be illogical to hold that a defendant can waive the right to arbitrate by failing to make arbitration-related discovery its first priority.

Besides being legally incorrect, the district court's "early discovery" rule will have troubling and unfair consequences. Most obviously, it will reward plaintiffs who knowingly disregard their own agreement to arbitrate and (perversely) penalize nonsignatory defendants who have no idea whether the plaintiffs accepted an arbitration agreement. In particular, plaintiffs who intentionally flout their prior commitments to arbitrate will secure rulings that nonsignatory defendants waived their right to arbitrate when such defendants do not seek "limited discovery" regarding *possible* arbitration agreements of which they are unaware. In addition, even on its own terms, the district court's rule is vague and unworkable. Although a defendant must apparently seek discovery regarding a plaintiff's acceptance (if any) of an arbitration agreement "earlier" than Defendants did here, 1-ER-7, the court never indicated *how* early a defendant must do so in order to avoid being charged with waiver of any arbitration right.

A standardless regime in which district courts police an invisible discovery clock and know waiver when they see it is inconsistent with the Supreme Court's instruction that "any doubts" regarding waiver must be resolved "in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24-25. It is difficult to square with the high bar litigants must clear to secure waiver, as well as the reality that waiver of the

arbitration right is "not favored." *Fisher*, 791 F.2d at 694. And it is wholly at odds with "rigorously" enforcing "arbitration agreements," as required under the Federal Arbitration Act ("FAA"). *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 506 (2018) (citation omitted). Indeed, it would effectively permit "judicial hostility to arbitration" under the guise of waiver doctrine—precisely what the FAA was enacted to prevent. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 89 (2000) (citation omitted); *see also Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022) (holding that courts may not "create arbitration-specific variants of federal procedural rules, like those concerning waiver").

The district court also stated that several Defendants "have known that the Coinbase arbitration agreement has been in effect for at least a decade"; that Defendants Leshner and Hayes knew about the Agreement because they are "Coinbase users"; and that some of Defendants' counsel participated in unrelated litigation "in 2021 and 2022" involving "motions to compel arbitration based on the Coinbase User Agreement." 1-ER-6 & n.5. This discussion wholly disregards the important distinction between knowledge of an arbitration agreement's *existence* and knowledge that a particular plaintiff *agreed* to the arbitration provision. That some (but not all) Defendants supposedly knew that Coinbase has an arbitration agreement and that Defendants' counsel referenced it in other cases, does not settle the question of whether Defendants knew that *Plaintiffs agreed to* the Agreement.

Only the latter matters for determining when a defendant acquires knowledge of an "existing *right* to compel arbitration." *Hill*, 59 F.4th at 468 (emphasis added).[4]

Finally, the district court's "early discovery" holding also led the court astray on the waiver analysis's second prong—namely, whether Defendants engaged in intentional acts inconsistent with a known arbitration right. *Id.* Because the district court charged all Defendants with knowledge of their arbitration right *before* Defendants learned that Plaintiffs had accepted a controlling arbitration agreement, the district court performed the prong two analysis with reference to Defendants' litigation conduct preceding the date Defendants became aware of their right to arbitrate. *See* 1-ER-7–8. But the relevant time from which to assess whether Defendants engaged in intentional acts inconsistent with an existing arbitration right is the date Defendants learned of their arbitration right: July 9, 2024. *Supra* at 29-30. Acts occurring prior to that date cannot be intentional acts inconsistent with Defendants' known arbitration right. Because Defendants promptly moved to

---

[4]    Although the district court suggested that Defendants had "prior knowledge that Coinbase required users to agree to arbitration through its User Agreement," 1-ER-6, the court cited no evidence establishing such knowledge. Defendants, once again, are not Coinbase. And it is Plaintiffs' burden to prove waiver. *See Martin*, 829 F.3d at 1124. In any event, knowledge that Coinbase "required users to agree to arbitration" as a general matter, 1-ER-6, does not establish knowledge of whether *Plaintiffs* had accepted the Agreement, or whether they had opted out at any point. *Supra* at 13-14, 29-30.

compel arbitration just a month after receiving Plaintiffs' discovery responses on July 9, they did not waive their right to arbitrate.

## II. THE AGREEMENT REQUIRES THE ARBITRATOR TO DECIDE WHETHER A NONSIGNATORY MAY ENFORCE THE ARBITRATION AGREEMENT AGAINST PLAINTIFFS

Under the FAA, an arbitration agreement may let "an arbitrator decide not only the merits of a particular dispute but also '"gateway" questions of "arbitrability,"'" such as whether that agreement "covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67-68 (2019) (citation omitted). When an agreement "delegates the arbitrability question to an arbitrator, a court may not override the contract" and "possesses no power to decide the arbitrability issue." *Id.* at 68.

### A. The Agreement Clearly And Unmistakably Delegates To The Arbitrator Whether Defendants Can Enforce It

The FAA "limits federal court review of arbitration agreements to two gateway arbitrability issues: '(1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the agreement encompasses the dispute at issue.'" *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009 (9th Cir. 2023) (citation omitted). The first question is a "contract-*formation* issue[] [that is] always [a] matter[] for judicial resolution." *Caremark*, 43 F.4th at 1030.

If a court determines that a contract has been formed, the second question asks how far that agreement extends (scope) or whether—and by whom—it can be

enforced (enforceability).  As to these "threshold arbitrability questions"—and in contrast to a contract-formation question—parties can "agree by contract that an arbitrator, rather than a court, will resolve" them.  *Henry Schein*, 586 U.S. at 65. Parties often do so through a "delegation provision," in which parties agree to arbitrate "whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).  It is well-settled that "whether the arbitration contract b[inds] parties who did not sign the agreement" is a gateway question of arbitrability amenable to delegation. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).  When there is a valid delegation clause, "all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance." *Caremark*, 43 F.4th at 1029-30.

An agreement must reflect "'clear and unmistakable' evidence" of intent to delegate arbitrability questions to the arbitrator.  *Henry Schein*, 586 U.S. at 69 (citation omitted).  When an agreement does so, "a court may not override the contract." *Id.* at 68.  To the contrary, courts must "'rigorously enforce' arbitration agreements according to their terms," *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (citation omitted), by undertaking a "close review of the words the[] parties used in their agreement," *JPay, Inc. v. Kobel*, 904 F.3d 923, 930 (11th Cir. 2018).

The Agreement clearly and unmistakably delegates the gateway question of nonsignatory enforcement in two independently sufficient ways: (1) by incorporating the AAA Rules; and (2) through an express delegation provision.

    1.    <u>The Agreement's Incorporation Of The AAA Rules Clearly And Unmistakably Delegates The Arbitrability Question Of Nonsignatory Enforcement To The Arbitrator</u>

The Agreement's incorporation of the AAA Rules provides clear and unmistakable evidence of intent to delegate the issue of nonsignatory enforcement. The Agreement states that "[t]he arbitration will be administered by the American Arbitration Association ('AAA'), in accordance with the Consumer Arbitration Rules (the 'AAA Rules') then in effect." 2-ER-82 (§ 1.4). Under AAA Rule 14, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA Rule 14(a), *supra*.

This Court has held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). And "virtually every circuit to have considered the issue" has reached the same conclusion. *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013); *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 846 (6th Cir. 2020) (collecting cases from

"eleven out of twelve" circuits analyzing AAA Rules or other similar arbitral rules). The terms of the AAA Rules clearly and unmistakably delegate questions of arbitrability that encompass nonsignatory enforcement in two ways.

*First*, the AAA Rules broadly delegate "jurisdiction[al]" issues to the arbitrator. AAA Rule 14(a), *supra*. As this Court has recognized, rules that "giv[e] the arbitral tribunal the authority to decide its own jurisdiction … vest the arbitrator with the apparent authority to decide questions of arbitrability." *Oracle Am.*, 724 F.3d at 1073. Such questions include whether a nonsignatory can enforce an arbitration agreement. In *Blanton*, the Sixth Circuit considered language in the AAA Rules giving the arbitrator "the power to rule on his or her own jurisdiction, *including* any objections with respect to the existence, scope, and validity of the arbitration agreement." 962 F.3d at 848 (citation omitted). The court held that this reference to "jurisdiction" delegated "whether a non-signatory may enforce [an] agreement under state contract law" to the arbitrator, precluding a court from resolving the question. *Id.*; *see also Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014) (same); *Anderton v. Practice-Monroeville, P.C.*, 164 So. 3d 1094, 1101-02 (Ala. 2014) (same). Here, the same provision of the AAA Rules applies, and it compels the same result.

*Second*, the AAA Rules also delegate disputes regarding the "scope of the agreement" to the arbitrator. The plain meaning of the word "scope" is the "range

of matters considered or dealt with." *Scope*, *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/scope (last visited Mar. 18, 2025). "Scope" thus connotes how far an arbitration agreement extends—that is, the circumstances in which it does or does not apply, or "whether the agreement covers a particular controversy." *Caremark*, 43 F.4th at 1029; *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995) (scope concerns "*whether* a particular merits-related dispute is arbitrable").

Questions of nonsignatory enforcement fit comfortably within the plain meaning of "scope." The parties dispute the "range of matters" that the Agreement "deal[s] with." *Scope*, *Cambridge Dictionary*, *supra*. Defendants contend the Agreement extends to certain disputes with nonsignatories, *infra* at 52-61; but Plaintiffs argue that the Agreement governs only disputes between signatories. Under the AAA Rules, the arbitrator must "rule on" this scope dispute. AAA Rule 14(a), *supra*.

Precedent confirms the meaning of the AAA Rules' text. "[B]ackground principles of state contract law regarding the scope of agreements" "includ[e] the question of *who is bound*" by an arbitration agreement pursuant to "'traditional principles'" such as "'estoppel.'" *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009) (emphasis added) (citation omitted). This Court has likewise recognized that a party's "status as a nonsignatory to the arbitration agreement does

not alter the applicability of state law" regarding the "'scope of agreements.'" *Knapke v. PeopleConnect, Inc.*, 38 F.4th 824, 831 (9th Cir. 2022) (citation omitted). Accordingly, it has held that the question of whether an arbitration agreement encompassed a signatory's claims against a nonsignatory was a "question[] of *the scope* of the arbitration agreement" that was "delegated to the arbitrators." *Portland Gen. Elec. Co. v. Liberty Mutual Ins. Co.*, 862 F.3d 981, 985-86 (9th Cir. 2017) (emphasis added). Here, the AAA Rules similarly delegate nonsignatory enforcement by giving the arbitrator "power" to make determinations of "scope" "as a preliminary matter." AAA Rule 14(a), (c), *supra*. That delegation squarely applies to the question of whether equitable estoppel applies to Plaintiffs' claim.

In short, by incorporating the AAA Rules, the Agreement twice delegates the issue of nonsignatory enforcement to the arbitrator by giving it the power to decide questions of "jurisdiction" and "scope." Each of these terms clearly and unmistakably delegates the nonsignatory enforcement issue here to the arbitrator.

> 2. The Agreement's Express Delegation Provision Leaves No Doubt That Nonsignatory Enforcement Is For The Arbitrator To Decide

The Agreement's express delegation provision independently constitutes clear and unmistakable evidence that questions of arbitrability—including questions of nonsignatory enforcement—must be resolved by an arbitrator.

Under the Agreement, "[t]he arbitrator shall have *exclusive authority* to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the *enforceability*, revocability, *scope*, or validity of the Arbitration Agreement." 2-ER-82 (§ 1.6) (emphasis added).

"California Courts interpret contracts containing arbitration provisions by application of the plain meaning rule—words of a contract are given their usual and ordinary meaning." *Johnson v. Walmart, Inc.*, 57 F.4th 677, 682 (9th Cir. 2023). Here, under the "usual and ordinary meaning" of the delegation clause's text, an arbitrator must decide nonsignatory enforcement. The clause unequivocally delegates to the arbitrator the "interpretation" of the "scope" and "enforceability" of the arbitration agreement. And the issue of nonsignatory enforcement is one of both "scope" and "enforceability" under any reasonable interpretation of those words.

As with the AAA Rules, the delegation provision's reference to "scope" requires the arbitrator to resolve questions of nonsignatory enforcement. 2-ER-82 (§ 1.6). The plain language and precedent regarding "scope" discussed above with respect to the AAA Rules apply equally to the delegation provision. *Supra* at 40-42.

The issue of nonsignatory enforcement also raises a question of "enforceability." Enforceability is the "character or quality of being enforceable," *Enforceability*, *Oxford English Dictionary*, https://www.oed.com/search/

43

dictionary/?scope=Entries&q=enforceability (last visited Mar. 18, 2025) (login required)—that is, whether someone can "compel by physical or moral force (the performance of an action, conformity to a rule, etc.)" or "impose (a course of conduct) on a person," *Enforce*, *Oxford English Dictionary*, https://www.oed.com/dictionary/enforce_v?tab=meaning_and_use#5398896 (last visited Mar. 18, 2025) (login required). The question of whether an agreement "compel[s] … the performance of an action" (namely, the action of arbitrating claims) encompasses questions about whether an agreement is valid—that is, whether it is legally binding and thus capable of "enforcement." *See Rent-A-Center*, 561 U.S. at 69 n.1. It also necessarily encompasses the question of whether an agreement can be enforced *by* a particular person—that is, whether the "arbitration clause" is enforceable "as to that defendant." *Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021) (citation omitted). Here, whether the arbitration agreement at issue here can be enforced *by* Defendants is a question of "enforceability." Indeed, in opposing arbitration below, Plaintiffs recognized that the merits question is "whether a non-signatory can enforce an arbitration agreement." 2-ER-24.

Case law confirms the point. As the Sixth Circuit held, "[w]hether a non-signatory can enforce a delegation clause is … a question of enforceability." *Becker v. Delek US Energy, Inc.*, 39 F.4th 351, 356 (6th Cir. 2022). That is because nonsignatory enforcement does not concern "whether the agreement *exists*" but

rather whether it is appropriate to "*enforce*" that agreement in the context of a particular dispute. *Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 144 (3d Cir. 2022); *see also Casa Arena Blanca LLC v. Rainwater ex rel. Estate of Green*, 2022 WL 839800, at *5 (10th Cir. Mar. 22, 2022). And, here, because "determin[ations]" of enforceability are vested in the arbitrator's "exclusive authority," a court is not permitted to adjudicate the issue of nonsignatory "enforcement."

In short, the straightforward text of the delegation clause resolves this dispute about who decides questions of nonsignatory enforcement by unequivocally delegating questions of both "scope" and "enforceability" to the arbitrator.

## B. The District Court Erred By Deciding The Question Of Nonsignatory Enforcement

The district court held that "the question of arbitrability with nonsignatories rests with" a court, "not an arbitrator." 1-ER-9–10. That conclusion flies in the face of each of the Agreement's two independently sufficient delegations.

1. First, the district court did not give effect to the Agreement's incorporation of the AAA Rules. The district court acknowledged Defendants' argument that the incorporation of the AAA Rules "precluded" the court from deciding "whether [D]efendants may move to compel arbitration" under the Agreement. 1-ER-8–9. But the court did not examine the text of the AAA Rules or any of the precedent interpreting those rules.

45

The district court apparently believed that the AAA Rules delegated questions of arbitrability to the arbitrator "only" if those questions arose in a dispute "between the signatories" to the Agreement. 1-ER-9 (citation omitted). In so holding, the court "conflate[d]" its view of "the *scope* of the arbitration clause … with the question of *who* decides arbitrability." *Oracle Am.*, 724 F.3d at 1076. AAA Rule 14 gives the arbitrator power to resolve questions of "jurisdiction," which has long been understood as "the authority of law[] to render a judgment or decree upon the *rights of the litigant parties*." *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 718 (1838) (emphasis added). Whether an arbitrator has authority to resolve a dispute between Defendants and Plaintiffs regarding their COMP purchases on Coinbase is thus a question of jurisdiction delegated to the arbitrator by the AAA Rules. The district court's holding that the arbitrator only possesses authority to decide jurisdictional questions in disputes *between signatories* cannot be squared with the AAA Rules' unqualified grant of authority to the arbitrator to rule on its own "jurisdiction." *Blanton*, 962 F.3d at 848.

2. The district court also misconstrued the Agreement's express delegation clause. Instead of addressing the language of the delegation provision itself, the court focused exclusively on the Agreement's "Preamble," which indicates that "the Arbitration Agreement covers 'Disputes between You and Coinbase' or 'You and Us.'" 1-ER-9 (quoting 2-ER-55–56) (capitalization normalized). Based

46

on this language, the court concluded that the scope of arbitration was limited to the parties to the agreement, because the "Arbitration Agreement plaintiffs signed was with Coinbase, not" Defendants. *Id.*

The district court reached this conclusion without *any* assessment of the language its decision should have turned on: the delegation clause itself. As discussed above, Section 1.6's grant of "exclusive authority" to the arbitrator to resolve disputes of "enforceability" and "scope" does not reflect any limitation to disputes among signatories. Rather, it refers to the *arbitrator's* authority—not to the parties—and uses language that courts have long understood to encompass nonsignatory enforcement. 2-ER-82 (§ 1.6).

In finding the "you and Coinbase" language dispositive, the district court overread this Court's decision in *Kramer v. Toyota Motor Corp.*, effectively interpreting it to hold that whenever an arbitration agreement contains prefatory language limiting the agreement to signatories, the parties cannot have intended to delegate the question of nonsignatory enforcement to the arbitrator. 705 F.3d 1122 (9th Cir. 2013). As an initial matter, *Kramer* did not analyze whether incorporation of the AAA Rules delegated questions of nonsignatory enforcement to the arbitrator. The AAA Rules thus provide an independent basis for reversal that would not require this Court to decide the precise scope of *Kramer*. But, regardless, *Kramer* is also distinguishable because the arbitration clause there was materially different.

47

Specifically, the arbitration clause in *Kramer* provided that "[e]ither you or we *may choose* to have any dispute between you and us decided by arbitration." 1-ER-9 n.9 (emphasis added) (quoting *Kramer*, 705 F.3d at 1124). Thus, unlike a conventional arbitration clause *requiring* arbitration, the agreement in *Kramer* had a trigger akin to a condition precedent: It applied only if one of the signatories so "ch[o]se" or "elect[ed]." 705 F.3d at 1124 (capitalization normalized) (quoting agreement). As *Kramer* stressed, the clause "employ[ed] the language 'you' and 'we' … to identify who may *elect* arbitration." *Id.* at 1125 (emphasis added). The signatories in *Kramer* thus did not agree to arbitrate *anything* unless the contractual counterparty had *first* "chosen" or "elected" to pursue arbitration. As this Court has subsequently explained, that language in *Kramer* "limiting *the right* to compel arbitration to a specific buyer and a specific dealership ... [necessarily] means that extraneous third parties may not compel arbitration." *Ngo v. BMW of N. Am., LLC*, 23 F.4th 942, 946-47 (9th Cir. 2022) (emphasis added). In such circumstances, "[t]he language of the contract[] … evidences Plaintiffs' intent to arbitrate arbitrability with the [signatory] and no one else." *Kramer*, 705 F.3d at 1127.

The Agreement, by contrast, has a mandatory arbitration clause without any such limitation on *who* can "choose," "elect," or otherwise invoke the Agreement's arbitration agreement. Instead of noting the possibility of a future "elect[ion]" to arbitrate, Plaintiffs, by signing the Agreement, *already* "agree[d]" that "any dispute"

48

would be "resolved by binding arbitration." 2-ER-81 (§ 1.1-.2). Whereas in *Kramer*, the unusual "election" clause meant that the delegation clause did not come into play if the "election" condition was not satisfied, the arbitration clause in the Agreement contains no such condition—and so a court must conduct a "close review of the words" used in the delegation clause to determine whether nonsignatory enforcement is delegated.[5] *JPay*, 904 F.3d at 930. Here, the delegation clause gives an arbitrator—not a court—"exclusive authority" to resolve "disputes arising out of or related to the interpretation" of the arbitration provision's "enforceability" or "scope." 2-ER-82 (§ 1.6).

In reading *Kramer* to imply that *any* contract containing "you or we" language precludes a finding of an intent to delegate nonsignatory enforcement, the district court vastly overextended this Court's precedent. Language identifying the parties to an agreement and imposing rights and obligations on them is ubiquitous in contracts. It cannot be the case that the presence of such language automatically means that the parties did not intend to delegate nonsignatory enforcement. Indeed, a nonsignatory will, by definition, always be excluded from the language identifying the parties to the agreement. If commonplace language simply defining the parties to an arbitration agreement is enough to nullify even a broad and unequivocal

---

[5]   Moreover, unlike the delegation clause here, the delegation clause in *Kramer* did not delegate questions of enforceability. 705 F.3d at 1124-25.

delegation clause like the one here, then it is difficult to see how nonsignatory enforcement could *ever* be validly delegated. That cannot be what *Kramer* intended.

Such a broad rule would directly conflict with the Supreme Court's recognition that "whether the arbitration contract b[inds] parties who did not sign the agreement" is a question of arbitrability that can be delegated. *Howsam*, 537 U.S. at 84 (citation omitted). And it would undermine the settled principle that "a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 870 (9th Cir. 2021) (citation omitted).

The district court's reading of *Kramer* would also put this Court in direct conflict with other circuits. Those circuits have repeatedly found that nonsignatory enforcement *can* be delegated even when "you and us" language is included in the agreement—provided there is, as here, a broad delegation clause. For example, the Third Circuit found the issue of nonsignatory enforcement delegated in an agreement that provided "You and We agree that either You or We have an absolute right to demand that any Claim be submitted to an arbitrator in accordance with this Arbitration Agreement," where a "[c]laim" included "anything related to … 'the enforceability, or the arbitrability of any Claim pursuant to this Agreement,

50

including but not limited to the scope of this Agreement.'" *Zirpoli*, 48 F.4th at 139 (quoting agreement).

Similarly, the Sixth Circuit found the issue of nonsignatory enforcement delegated where a "dispute" was defined as "any claim or controversy of any kind between you and Plain Green" including "any issue concerning the validity, enforceability, or scope of this Agreement." *Swiger*, 989 F.3d at 503 (quoting agreement). In both cases, the "you and us" language did not preclude delegation of nonsignatory enforcement; instead, the courts applied the plain language of the *delegation* provision, which allowed the arbitrator to decide questions of "enforceability" and "scope" in the first instance. *Zirpoli*, 48 F.4th at 144-45; *Swiger*, 989 F.3d at 506-07.

The district court's decision finding the "you and Coinbase" language in the arbitration agreement's preamble dispositive was flatly incompatible with those decisions. Indeed, the Agreement's delegation was even clearer than those in *Zirpoli* and *Swiger*, because it bestows "exclusive authority" on the arbitrator to decide "enforceability" and "scope."[6]

---

[6] Affirming the district court's decision would also put this Circuit in significant tension with the approaches of the Second and Eighth Circuits. *See Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 211 (2d Cir. 2005) (nonsignatory enforcement "is a matter of the Agreement's continued existence, validity and scope, and is therefore subject to arbitration under the terms of the arbitration clause"); *Eckert/Wordell Architects*, 756 F.3d at 1100 ( "Whether a particular arbitration provision may be

## III.   PLAINTIFFS ARE EQUITABLY ESTOPPED FROM AVOIDING ARBITRATION OF THEIR CLAIM

Even if the district court were the appropriate decision-maker, it erred in holding that Defendants could not enforce the arbitration agreement under the doctrine of equitable estoppel.

### A.   Equitable Estoppel Bars Plaintiffs From Avoiding Arbitration Of Their Claim

California law allows a "nonsignatory defendant [to] compel a signatory plaintiff to arbitrate under the doctrine of equitable estoppel." *JSM Tuscany, LLC v. Super. Ct.*, 193 Cal. App. 4th 1222, 1238 (2011). This doctrine permits "a nonsignatory to a contract [to] enforce an arbitration provision" when (1) "'the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory'" that is within the scope of the arbitration agreement; or (2) "'the claims [against the nonsignatory] are "intimately founded in and intertwined with" the underlying contract.'" *Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 707 & n.5 (9th Cir. 2024) (alterations in original) (citations omitted). When plaintiffs' claims relate to a contract requiring arbitration in either of these ways, "it would be unfair for [the plaintiff] to avoid arbitration." *Franklin*,

_____

used to compel arbitration between a signatory and a nonsignatory is a threshold question of arbitrability.").

52

998 F.3d at 875. Both of these independent bases for equitable estoppel require arbitration of Plaintiffs' Section 12(a)(1) claim.

1. A plaintiff cannot avoid arbitration when his claim relies on allegations of "pre-arranged, collusive behavior" by a signatory and a nonsignatory defendant that are "intertwined with the obligations imposed" by a contract. *Metalclad Corp. v. Ventana Env't Org. P'ship*, 109 Cal. App. 4th 1705, 1718 (2003) (citation omitted). As the California courts have explained, this theory of equitable estoppel "applies when a party has signed an agreement to arbitrate but attempts to avoid arbitration by suing nonsignatory defendants for claims that are 'based on the same facts and are inherently inseparable' from arbitrable claims against signatory defendants." *Id.* at 1713 (citation omitted). Under this rule, if a plaintiff's claim against a signatory would "no doubt" be subject to arbitration pursuant to their agreement, then the plaintiff cannot avoid arbitration under that agreement by leveling the "same set of allegations" against a nonsignatory. *Young v. ByteDance, Inc.*, 700 F. Supp. 3d 808, 814 (N.D. Cal. 2023).

This theory of equitable estoppel plainly applies here. Plaintiffs' factual allegations and arguments opposing dismissal turned on assertions of "collusive behavior" between Defendants and Coinbase. *Metalclad*, 109 Cal. App. 4th at 1718 (citation omitted). According to Plaintiffs, Defendants paid, "persuaded," and "worked directly with Coinbase" to list COMP for trading. 2-ER-166, 171.

According to Plaintiffs, Coinbase was "easily able to coordinate" with Defendants to "quickly list" COMP because "Coinbase made a 2018 investment in Compound Labs." 2-ER-197 (¶ 66). Plaintiffs also assert that Defendants and Coinbase jointly promoted COMP sales, alleging that "one or more" Defendants "agreed to pay Coinbase a commission to sell or provide COMP to its investors," and that Coinbase in turn agreed "to encourage those investors to invest in COMP through 'education videos' created by or at the direction of one or more" Defendants. 2-ER-198 (¶ 70); 2-ER-167, 172, 176. Because Plaintiffs allege that Defendants "direct[ed]" actions to promote COMP and Coinbase "execut[ed]" those actions, there is a "basis for equitable estoppel" here. *ByteDance, Inc.*, 700 F. Supp. 3d at 814.

This alleged collusive behavior forms the basis for Plaintiffs' sole claim under Section 12(a)(1). Plaintiffs seek to rescind their purchases of COMP made on Coinbase's site based on a theory that Defendants solicited those purchases. A plaintiff seeking to prove that a defendant "successfully solicit[ed]" his purchase must show (1) the defendant urged the plaintiff to buy a particular security, (2) the plaintiff was aware that the defendant urged his purchase, and (3) the defendant had a motive to benefit itself or the owner of the security purchased by the plaintiff. *Pinter v. Dahl*, 486 U.S. 622, 646-47 (1988). All three independent elements must be met to show that a plaintiff "'purchased' the security from" the defendant and that it is "fair" to "align" the defendant with the security's "owner in a rescission

action." *Id.* at 647. Plaintiffs' effort to satisfy these three requirements depends on the concerted conduct described above. Plaintiffs argue that (1) they were urged to purchase when COMP was listed for sale on Coinbase's platform, (2) they saw promotional videos for COMP on Coinbase Earn, and (3) their trading in COMP on Coinbase's secondary market financially benefited Defendants. 2-ER-169–73.

These allegations of interdependent misconduct underpinning Plaintiffs' claim are "covered by the arbitration agreement['s]" broad terms. *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398-99 (5th Cir. 2006). The Agreement mandates arbitration of "any dispute … relating in any way to … any products sold or distributed through the Coinbase Site." 2-ER-81 (§ 1.1). That language would undoubtedly apply if Plaintiffs had brought this exact same claim based on these exact same allegations against Coinbase. Plaintiffs therefore cannot "avoid arbitration by suing nonsignatory defendants for claims that are 'based on the same facts and are inherently inseparable'" from arbitrable claims they strategically chose not to bring against Coinbase. *Metalclad*, 109 Cal. App. 4th at 1713 (citation omitted).

2. Equitable estoppel also applies because Plaintiffs' claim is intimately founded in and intertwined with the Agreement. A claim is "'intimately founded in and intertwined with'" a contract containing an arbitration agreement when it "is rooted in" a "relationship" "governed by" that contract, *Franklin*, 998 F.3d at 874-

75 (citation omitted), or based on "alleged conduct under" that contract, *Herrera*, 104 F.4th at 708. To evaluate this basis for equitable estoppel, courts examine the "relationship between the parties and their connection to the alleged violations." *Franklin*, 998 F.3d at 875.

The "alleged violations" at issue here are "rooted" in Plaintiffs' relationship with Coinbase, which is "governed by" the Agreement. *Id.* Specifically, three essential elements of Plaintiffs' Section 12(a)(1) claim *depend* on a relationship with Coinbase that is "governed by" the Agreement. *Id.*

*First*, as noted, Plaintiffs are pressing a solicitation theory only. That solicitation theory is "rooted in" Defendants' alleged efforts to urge COMP purchases on Coinbase and Plaintiffs' use of Coinbase to purchase their COMP. *Id.* Indeed, in opposing dismissal, Plaintiffs relied on conduct governed by Coinbase's Agreement by asserting that "paying Coinbase to advertise COMP tokens for purchase" via Coinbase Earn was part of Defendants' "comprehensive plan to solicit the investing public to purchase COMP." 2-ER-165–67; 2-ER-197–98 (¶¶ 70-71). And in denying dismissal, the district court relied on the same allegations. 2-ER-158 n.4.

These supposedly solicited transactions are "governed by" the Agreement, *Franklin*, 998 F.3d at 875, because, as noted, the Agreement applies to "any dispute … relating in any way to ... any products sold or distributed through the

Coinbase Site." 2-ER-81 (§ 1.1); *see also* 2-ER-59 (§ 3.2) ("Coinbase acts as the agent … to facilitate [every digital asset] purchase or sale between [buyers] and other Coinbase customers."). Because Plaintiffs "decided the theories on which to sue" Defendants and chose to make Coinbase essential to their solicitation theory, it "is not unfair" to require them to arbitrate their claim pursuant to the Agreement. *Rowe v. Exline*, 153 Cal. App. 4th 1276, 1290 (2007).

*Second*, Plaintiffs assert that transactions in COMP constitute securities transactions. According to Plaintiffs, "COMP [i]s a [s]ecurity" in part because "investors reasonably expect that the efforts" of others "will result in appreciation of the COMP token." 2-ER-217, 219 (¶¶ 180-83); *see SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) (an investment contract requires "an investment of money in a common enterprise with profits to come solely from the efforts of others"). Plaintiffs allege that Coinbase "facilitat[es] investors' use of COMP solely as an investment asset" because Coinbase prevents "[u]sers who store their COMP tokens on" the platform from "exercis[ing] governance rights." 2-ER-198, 214 (¶¶ 72, 149). Indeed, Plaintiffs emphasized Coinbase's restrictions on the use of "'governance' assets" stored on its platform in opposing dismissal, arguing that it showed that COMP was a "speculative investment." 2-ER-167–68.

These allegations regarding Coinbase's restrictions on the use of governance tokens directly implicate the Agreement and alleged conduct subject to it. *See*

*Herrera*, 104 F.4th at 708.  The Agreement does not allow Coinbase users to participate in "protocol governance" by voting tokens.   2-ER-57–58 (§ 2.4). Plaintiffs' argument that transactions in COMP are subject to the federal securities laws thus relies on a restriction imposed by the Agreement.  But Plaintiffs are "not entitled to make use of [the Agreement] as long as it worked to [their] advantage" in arguing that COMP is a security, and "then attempt to avoid its application in defining the forum in which [their] dispute … should be resolved." *Metalclad*, 109 Cal. App. 4th at 1714 (citation omitted).

*Third*, Plaintiffs' remedy in this action depends on their use of Coinbase.  The "remedy" for a solicitation claim is "rescission" of the plaintiff's purchase or, if the plaintiff has sold, damages equal to rescission. *Randall v. Loftsgaarden*, 478 U.S. 647, 655 (1986).  If rescission of a purchase would result in the plaintiff receiving less than the value of the security at issue, the claim fails. *See Com. Union Assurance Co. v. Milken*, 17 F.3d 608, 615-16 (2d Cir. 1994).  Similarly, if a plaintiff has sold the security and seeks rescissory damages, his claim fails if he did not "suffer[] a loss" on the sale. *Wolfe v. Mattel, Inc. (In re Broderbund/Learning Co. Sec. Litig.)*, 294 F.3d 1201, 1205 (9th Cir. 2002).

Plaintiffs must rely on their relationship with Coinbase to establish that they are entitled to rescission or suffered rescissory damages.  Under the Agreement, the "final price of each transaction" includes Coinbase's fees.   2-ER-59 (§ 3.3).

Plaintiffs would thus need to use Coinbase's records to prove the price they paid for COMP, *see id.*, and that they "suffered compensable damages," *Com. Union Assurance Co.*, 17 F.3d at 615. The connection between Plaintiffs' claim and the Agreement here mirrors the intertwinement in *Herrera*, where "determin[ing] the appropriate refund amount" would require "know[ing] how much the [consumers] paid [the vendor] for the tickets—a transaction governed by" an arbitration agreement. 104 F.4th at 710.

In these three ways, Plaintiffs seek to *use* their relationships with Coinbase to prove their claim. When plaintiffs rely on a relationship governed by an agreement with a broad arbitration clause that encompasses their claim, they cannot avoid their contractual obligation to arbitrate.

## B. The District Court Erred In Rejecting Defendants' Equitable Estoppel Arguments

The district court concluded that neither prong of California's equitable estoppel test applied here. 1-ER-10–12. The district court was wrong on both counts.

First, the district court concluded that Plaintiffs' allegations about Coinbase did not constitute "'interdependent and concerted misconduct'" because "plaintiffs could have purchased COMP on any exchange and alleged the exact same claim against" Defendants. 1-ER-11–12. That rationale fails on its own terms. Plaintiffs' theory of the case and the district court's motion-to-dismiss decision both relied on

59

*specific* instances of concerted conduct with Coinbase, not conduct with "any exchange." *See supra* at 10-13. To the contrary, that alleged concerted conduct involved features *unique* to Coinbase, such as the videos on Coinbase Earn and Coinbase's restriction on governance-token voting. *Supra* at 8-9, 12, 57-58. Regardless, the district court's invented "any exchange" test has no grounding in the law. Whether a defendant could have worked with a different alleged co-conspirator says nothing about whether equitable estoppel is appropriate. Rather, the test focuses on what *actually* occurred—*i.e.*, whether Defendants did, in fact, engage in concerted action with Coinbase, and whether, if Plaintiffs brought the "same set of allegations" against Coinbase, they would have been bound to arbitrate. *ByteDance, Inc.*, 700 F. Supp. 3d at 815.

Second, the district court also erred in rejecting the second avenue for equitable estoppel under California law, which applies when a plaintiff's claim is "rooted in" a "relationship" that is "governed by" an arbitration agreement. *Franklin*, 998 F.3d at 875. The district court reasoned that Plaintiffs' claim "do[es] not implicate Coinbase" because "[t]here is no liability asserted against Coinbase" and Plaintiffs did not "rely on" the Agreement. 1-ER-10–11. That is not a barrier to estoppel. This Court has compelled arbitration with nonsignatories "[e]ven though" signatory plaintiffs "d[id] not mention" the arbitration agreement. *A.B. v. Chart Indus., Inc. (In re Pac. Fertility Ctr. Litig.)*, 814 F. App'x 206, 209 (9th Cir.

60

2020).  This is because "the relationship between the parties and their connection to the alleged violations"—not whether a party is named as a defendant in a complaint, or whether the plaintiff happens to mention the arbitration agreement—determines whether equitable estoppel applies.  *Franklin*, 998 F.3d at 875.

The district court recognized that "Coinbase's actions are relevant … to resolve this claim," yet believed that because Plaintiffs sued under Section 12(a)(1) of the Securities Act, it would "not need to address (much less rely on) the Coinbase User Agreement."  1-ER-10–11.  But regardless of whether a plaintiff's cause of action is statutory, equitable estoppel applies when a plaintiff's claim hinges on a relationship governed by an arbitration agreement.  For example, although the nurse in *Franklin* alleged that a hospital violated its "statutory obligations" under wage-and-hour laws, the nurse's claims were "rooted in her employment relationship" with the staffing agency, "which [wa]s governed by the Arbitration Agreement" in her employment contract.  998 F.3d at 875.  Here, too, Coinbase is "central" to Plaintiffs' statutory claim seeking rescission of their COMP purchases on Coinbase's platform. *Id.*  And because that relationship is governed by the Agreement's sweeping arbitration provision, Plaintiffs must arbitrate their claim.

# CONCLUSION

The district court's order denying Defendants' motion to compel arbitration should be reversed.

Dated:  March 20, 2025

Respectfully submitted,

*s/ Roger A. Cooper*
Roger A. Cooper
Samuel Levander
CLEARY GOTTLIEB STEEN &
  HAMILTON, LLP
1 Liberty Plaza, Suite 1000
New York, NY 10006
(212) 225-2000
racooper@cgsh.com

*Counsel for Polychain Alchemy, LLC*

*s/ Zachary Faigen*
Peter B. Morrison
Zachary Faigen
SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM, LLP
2000 Avenue of the Stars, Suite 200 N
Los Angeles, CA 90067
(213) 687-5000
peter.morrison@skadden.com

Alexander Drylewski
SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM, LLP
1 Manhattan West
New York, NY 10001
(212) 735-3000

*Counsel for Paradigm Operations, LP*

*s/ Samir Deger-Sen*
Samir Deger-Sen*
Benjamin A. Naftalis
Douglas K. Yatter
Peter Trombly
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
samir.deger-sen@lw.com

* Pursuant to Circuit Rule 25-5(f),
counsel attests that all other parties on
whose behalf this brief is submitted
concur in the filing's content.

Susan E. Engel
David Steinbach
Alexander G. Siemers
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Morgan E. Whitworth
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

*Counsel for AH Capital Management*
*L.L.C.*

62

| | |
|---|---|
| *s/ Jason Gottlieb* | *s/ Kayvan B. Sadeghi* |
| Jason Gottlieb | Kayvan B. Sadeghi |
| Michael Mix | JENNER & BLOCK, LLP |
| Vani Upadhyaya | 1155 Avenue of the Americas |
| MORRISON COHEN LLP | New York, NY 10036 |
| 909 3rd Avenue, 27th Floor | (212) 891-1600 |
| New York, NY 10022 | ksadeghi@jenner.com |
| (212) 735-8600 | |
| jgottlieb@morrisoncohen.com | |
| | An N. Tran |
| *Counsel for Robert Leshner, Geoffrey Hayes, and Gauntlet Networks, Inc.* | JENNER & BLOCK, LLP |
| | 525 Market Street, 29th Floor |
| | San Francisco, CA 94105 |
| | (628) 267-6800 |
| | |
| | *Counsel for Bain Capital Ventures (GP), LLC* |

*Counsel for Defendants-Appellants*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Defendants-Appellants state the appeal in *Young v. Solana Labs, Inc.*, No. 24-6032 (9th Cir.) is currently pending before this Court and raises the same or substantially related issues regarding delegation of questions of scope and enforceability.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**  <u>24-7243</u>

     I am an attorney for Defendant-Appellant AH Capital Management, L.L.C.

     This brief contains 13,961 words, including 0 words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

     I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**  <u>s/ *Samir Deger-Sen*</u>       **Date**  <u>March 20, 2025</u>